J-S18002-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: H.J.L., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>: |
| APPEAL OF: S.L., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>: No. 42 MDA 2026 |

Appeal from the Decree Entered December 3, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0087

| | |
|---|---|
| IN RE: ADOPTION OF: J.N.M., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>: |
| APPEAL OF: S.L., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>: No. 43 MDA 2026 |

Appeal from the Decree Entered December 3, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0088a

| | |
|---|---|
| IN RE: ADOPTION OF: A.E.M., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>: |
| APPEAL OF: S.L., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>: No. 44 MDA 2026 |

Appeal from the Decree Entered December 3, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0089a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 45 MDA 2026 |

Appeal from the Decree Entered December 3, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0090a

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:                **FILED: JULY 24, 2026**

S.L. ("Mother") appeals from the December 3, 2025 decrees that terminated her parental rights to nine-year-old C.L., eight-year-old H.L., five-year-old J.M. and four-year-old A.M. (collectively, "Children").[1]  Mother avers that the trial court erred in terminating her parental rights pursuant to Section 2511(a) but, notably, has not raised a challenge to the court's Section 2511(b) findings.  *See* 23 Pa.C.S. §2511.  Upon review, the record supports the trial court's termination of Mother's parental rights pursuant to Section 2511(a) and, therefore, we affirm.

On November 22, 2023, the York County Office of Children and Youth (the "Agency") obtained emergency custody of Children after receiving both a

_____

[1] A.L. is the biological father of C.L. and H.L. and the legal father of A.M. and J.M. because he is married to Mother.  R.M. is the biological father of A.M. and J.M.  The trial court also terminated the parental rights of A.L. and R.M. on December 3, 2025.  R.M. filed a separate appeal at Docket Nos:  17 MDA 2026 and 46 MDA 2026 and is not a party to this appeal.

- 2 -

general protective services ("GPS") report as well as a child protective services ("CPS") report regarding Children. The GPS report alleged that Mother had mental health and substance abuse issues and that she put Children at risk by failing to provide adequate shelter, clothing, and supervision. Additional allegations included that Mother brought Children to Pennsylvania to live with her boyfriend and ended up homeless; that Mother dropped Children off at an emergency daycare with the intention of going to a methadone clinic but, instead, went to get her nails done; and Children's fathers' whereabouts were unknown. The CPS report alleged that J.M. had old and new unexplained injuries. After investigation, the Agency determined that the injuries were a result of Mother's lack of supervision and indicated the CPS report.

On February 15, 2024, the trial court adjudicated Children dependent and ordered Children to remain placed in foster care. The Agency implemented a Family Service Plan and established the following objectives for Mother: to establish housing and income stability and address mental health, substance abuse and recovery, and parenting skills. Additionally, the Agency scheduled bi-weekly supervised visitation between Mother and Children. The court continued to hold regular permanency review hearings.

On September 24, 2025, the Agency filed petitions to terminate Mother's parental rights. The trial court appointed legal counsel for Children and held a hearing on December 2, 2025. By agreement of the parties, the dependency proceeding findings were incorporated into the termination of parental rights hearing. Additionally, the Agency presented testimony from Misty Grove,

family advocate with Catholic Charities; Meredith Callahan, counselor with EquiTeam Support Services; Destiney Michael, Agency caseworker; Stephanie Tordoroff, art therapist for J.M.; Kristie Litzinger, foster mother for A.M.; and Sharon Stites, foster mother for C.L., H.L., and J.M. Mother testified on her own behalf.

Ms. Michael testified in accordance with the above-stated facts. Additionally, she testified that Mother "has been cooperative with drug testing throughout the life of the case." N.T. H'rg., 12/2/25, at 87. She explained that Mother had a prescription for Suboxone that is provided by Pyramid and that "she did recently at the end of October provide a presence of treatment letter from Pyramid [which] was the first one that I had received in some time[.]" *Id.* Ms. Michael testified that Mother's current housing is not appropriate. She explained that provider agency Pressly Ridge has worked with Mother throughout the life of the case to assist her in obtaining appropriate housing. Ms. Michael informed the court that Mother has maintained employment and pays a small amount of child support for Children.

Ms. Michael explained that the Agency had to switch service providers from Pressley Ridge to Catholic Charities because of "[M]other's inability to really work or cooperate with any of the therapeutic staff at Pressley Ridge over the course of two years of involvement, [which] likely plays into the mental health concerns." *Id.* at 115.

Ms. Michael testified that Mother has not consistently attended mental health treatment. She explained that Mother reported completing a mental health evaluation that diagnosed her with a personality disorder but never provided a copy of the evaluation to the Agency. Ms. Michael further explained that Mother began outpatient treatment with TrueNorth Wellness and "reported to the team that she felt like the frequency of that treatment was not high enough to meet her needs and that she wanted to seek treatment with another provider or another therapist that could meet her on a frequent basis and have more impactful services." *Id.* at 89. Ms. Michael testified that Mother ceased treatment with TrueNorth Wellness and is not currently receiving any mental health treatment.

Ms. Michael testified that Mother attended parenting curriculum with PA Child and had some attendance issues part way through the course but eventually completed the curriculum. She explained that even through Mother completed the parenting program, "she's continued to have a need or exhibit a need for coaching from the different visitation providers that have worked in the case. So there still appears to be a need to develop further parenting skill[s] in the case." *Id.* at 88.

Ms. Michael testified that Mother has been consistent with her visits and confirmed that Mother has not progressed to unsupervised visitation. Ms. Michael explained that the visits had to be "double staffed to maintain the safety of [C]hildren during the visits." *Id.* at 94. Ms. Michael testified that

Mother has not been able to demonstrate an ability to manage "all four of the kids at one time." *Id.* at 95.

Ms. Michael stated that Mother periodically requests updates about Children, has provided gifts and prepared activities for visits, and occasionally reaches out to Children's therapists.

Ms. Michael testified that it was in Children's best interest to terminate Mother's parental rights. She opined that the Children have an "observable relationship" with Mother and that the two older children, C.L. and H.L., have a "bond" with Mother and "they know who she is to them." *Id.* at 99, 103. She further testified, however, that that "being in this place of in between and having visits and not really knowing what's going to happen I think is causing them more harm than good. I think they need to know where they're going to end up and know that they're going to have a safe home and stable school and stable services to help relieve some of their anxieties." *Id.* at 99. She explained that C.L. experiences "parentified behaviors" towards Mother and his siblings. *Id.* Ms. Michael further explained that "the longer that we keep them in this place of dependency . . . it's not allowing any finality or any ability to move past their situation or move past their prior trauma or instability." *Id.*

Ms. Grove testified that she has been working with Mother since October 2025, or approximately two months. She supervises weekly visits between Mother and Children. Ms. Grove confirmed that she suggested therapeutic visits would be appropriate between Mother and Children. She also confirmed

that she suggested that A.M. have a separate visit with Mother than the other three boys due to A.M.'s young age, lack of bond between Mother and A.M., and the siblings' jealousy over the amount of hands-on attention that A.M. required. Ms. Grove testified that she has observed three visits since the visits have been separated, and they are going well. She also testified that she has assisted Mother with budgeting, finding housing, and reengaging in therapy over the past two months. Ms. Grove characterized Mother's progress as "significant" during the two months leading up to the hearing. *Id.* at 22. Ms. Grove confirmed that Mother was close to obtaining appropriate housing for Children, but lost funding.

Ms. Callahan testified that she provides trauma-based outpatient counseling services to C.L. and H.L. She described the session as having two components: the first being neurofeedback, during which she speaks with C.L. and H.L., and the second being equine therapy, during which the children interact with horses. Ms. Callahan testified that she is working with C.L. on anxiety, anger, and self-regulation and that she is working with H.L. on anger, self-regulation, and self-esteem. She testified that both are making slow progress. Ms. Callahan confirmed that Mother has not been in contact with her.

Ms. Tordoroff testified that she has provided art therapy to C.L. and H.L. since December 2023 and J.M. since November 2024. She testified that C.L. is receiving therapy for general anxiety and sadness while H.L. and J.L. are receiving therapy for anger issues. She explained that C.L. is experiencing

sadness because he misses Mother. She testified that all three children are making slow progress. Ms. Tordoroff confirmed that Mother reached out once regarding the therapy.

Ms. Litzinger testified that A.M. has been placed with her since November 2023. She explained that A.M. calls her and her husband "mom" and "dad," is "very bonded" to everyone in the household, and looks to foster parents for comfort, supports, needs, and affection. *Id.* at 50, 56. Ms. Litzinger explained that A.M. has some escalating behavioral challenges including hitting, being defiant, and climbing furniture to access restricted items, and that she is looking into services that might help A.M. She explained that A.M. recognizes that he has "two mommies" and "two daddies." *Id.* at 51. She testified that A.M. does not request to see Mother. She confirmed that she schedules visits and activities with A.M.'s older siblings and that she remains a pre-adoptive resource for A.M.

Ms. Stites testified that she is the foster mother for C.L., H.L., and J.M. She explained that C.L. and H.L. have been living with her since November 2023 and J.L. joined the home in September 2024. She testified that C.L., H.L., and J.M. are all doing well in the home, are always together, and have a "really good relationship" with each other. *Id.* at 61. She testified that J.M. has behavioral issues at home and at school, including hitting, pinching, and acting defiantly but that he is helpful at home with his six-year-old special needs foster sister and enjoys playing with his brothers. She confirmed that J.M. goes to both foster parents for comfort when he is upset.

Ms. Stites testified that H.L. struggles in school and has anger issues. She testified that he has an I.E.P. is now receiving small group instruction from a reading specialist, one-on-one instruction from his math teacher, and homework assistance before school. She confirmed that H.L. usually goes to foster father for comfort when he is upset.

Ms. Stites explained that C.L. has anger issues, does well in school, is "fairly parentified," and likes being the big brother. *Id.* at 61. She explained that C.L. worries if there is a missed visit with Mother and will comment that "we have to go see Mom" because "I need to know she's okay." *Id.* at 77. Ms. Stites testified that C.L. knows that Mother's parental rights might be terminated and that he might not visit her anymore. Ms. Stites further testified that C.L. explained to Ms. Stites that "one of the things he was concerned about was if he doesn't go back to mom, who's going to take care of her." *Id.*

She explained that C.L., H.L., and J.M. call her and her husband "Sharon" and "Todd" or "Mama Sharon" and "Papa Todd." She informed the court that they are initiating family therapy for C.L., H.L., and J.M. soon. Ms. Stites confirmed that she remains a pre-adoptive resource for C.L., H.L., and J.M. and can handle their behaviors. She also confirmed that she has arranged visits between C.L. and H.L. and their paternal grandparents who live in Minnesota.

Mother testified that she left Texas for Pennsylvania with Children and all of her belongings in her car to "leave abuse." *Id.* at 120. She explained

that she did not have any family or resources in Pennsylvania but came to this state because a child protective service caseworker in Texas told her that he had a three-bedroom home in Pennsylvania where she could live. Mother explained her attempts to find housing through Section 8, YMCA, Bell housing, Bell opportunities next door, and the SOR program. She testified that she has been employed at Yorkview Nursing Home as a therapeutic recreation therapist for a year and ten months. Mother testified that she is unable to get a driver's license in Pennsylvania because she is still trying to get necessary paperwork from Texas. Mother stated that she had an opportunity to secure a two-bedroom apartment two weeks ago but attempted to apply for "more sustainable" housing and lost the two-bedroom apartment. *Id.* at 123. Mother testified that she had a lapse in mental health treatment due to insurance issues but that she has an upcoming appointment with PA Counseling. Mother explained that she has participated in parenting classes, takes urine tests through Justice Works, and meets with Catholic Charities once or twice a week "as therapy." *Id.* at 126.

Mother testified that there were some gaps in visitation with Children when the visits switched from Pressley Ridge to Catholic Charities. Mother described the visits as "emotional" and explained that everyone is happy at the start of the visit and then Children are "upset over small things" towards the end of the visit because they know the visit is going to end. *Id.* at 127. She testified that she brings supplies to the visits, including diapers, wipes, paper and pencils, coloring stuff, and gifts on birthdays. Mother explained

that the only thing preventing her from reunifying with Children is housing. She also explained that the reports that she was unable to get along with any staff from Pressley Ridge was untrue. She testified that she only had a problem with one staff member, Jessica Weymer. Finally, Mother testified that she loves her kids.

At the conclusion of the hearing, the trial court terminated Mother's parental rights to Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b).[2, 3]

Mother timely appealed. Mother and the trial court both complied with Pa.R.A.P. 1925.

In her brief to this Court, Mother raises a sole issue for our review: "Did the trial court commit an abuse of discretion and error of law in terminating Mother's parental rights when the obstacles to reunification were financial in nature[?]" Mother's Br. at 5.

As an initial matter, Mother failed to preserve this issue for our review by not including it in her Rule 1925(b) statement, and the trial court failed to address it. *See* Pa.R.A.P. 1925(b)(4)(vii) (explaining that issues not included in a Rule 1925(b) statement are waived). Accordingly, we are constrained to

---

[2] Children's guardian *ad litem* ("GAL") and legal counsel for H.L. and A.M. agreed with this disposition. J.M.'s legal counsel was unable to ascertain J.M.'s position. C.L.'s legal counsel represented to the court that C.L. wanted to live with Mother and visit with his foster parents.

[3] As stated above, Mother fails to raise a challenge to Section 2511(b) in her Rule 1925(b) statement or in her brief to this Court and, therefore, we decline to address the trial court's findings under this subsection.

conclude that her arguments pertaining to this issue are waived. However, because Mother raised a general challenge to Section 2511(a) in her Rule 1925(b) statement, and the trial court addressed it, we will review the trial court's findings under Section 2511(a). As explained below, the record supports the trial court's findings.

* * *

In cases involving the involuntary termination of parental rights, this Court's review "is limited to determining whether the trial court's determination is supported by competent evidence." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the trial court's findings of fact and credibility determinations if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in

the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." ***L.A.K.***, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." ***In re Adoption of A.C.***, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." ***Id.*** (citation omitted). "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights[,]" the court then engages in "the second part of the analysis pursuant to Section 2511(b):

determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted).

Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a) to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(2).

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *see In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include "acts of refusal as well as incapacity to perform parental duties." *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019).

Sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).

- 14 -

This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

In its opinion, the trial court found that "Mother's continued incapacity has caused [C]hildren to be without essential parental care under [Section] 2511(a)(2)." Tr. Ct. Op., 2/3/26, at 18. The court placed great weight on Mother's failure to progress to unsupervised visitation with Children and her refusal to participate in consistent mental health treatment. The court opined:

> Mother's inability, or outright refusal, to follow through with many of her service goals stifled her progress with [C]hildren beyond supervised visitation. . . Mother's current housing is not appropriate for reunification with [C]hildren. She has been inconsistent in her mental health treatment and providing proof of the same to the Agency. Although she completed parenting education courses, there remained a need for supervision and coaching with respect to her parenting skills in order to ensure the safety of these young children in public. Indeed, Mother has not progressed past supervised visitation due to the continued need for some parenting coaching and also just to maintain the safety of [C]hildren during visits. The [c]aseworker reported that Mother cannot manage all four children at one time.

*Id.* The court also found that "the record is replete with evidence that [C]hildren struggle with significant emotional and behavioral issues, which Mother is not equipped to handle." *Id.* at 18. The court emphasized that it was in Children's best interest to remain in their respective foster homes, "an

environment which provides access to mental health resources." ***Id.*** As stated above, the record supports the trial court's findings.

We first note that the reason that the trial court terminated Mother's parental rights is not for financial reasons, but Mother's inability to provide safety, security, and stability for Children on a consistent basis.

Additionally, the record supports the trial court's reasoning for terminating Mother's parental rights. In particular, the evidence demonstrates that Mother's refusal to engage in consistent mental health treatment, inability to progress past supervised visitation, inability to visit properly with all four children at one time, and her failure to obtain suitable housing for over two years—despite numerous resources at her disposal—has caused Children to be without the essential parental care, control or subsistence necessary for their physical or mental well-being. Mother has had two years to remedy the situation, and it is unlikely that she will be able to care for Children anytime soon. Accordingly, the court did not abuse its discretion when it terminated Mother's parental rights pursuant to Section 2511(a)(2).

* * *

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a)(2). In light of our disposition, we decline to address Mother's arguments as they relate to

other subsections of 2511(a). Moreover, because Mother failed to raise a challenge to Section 2511(b), we also decline to address the trial court's findings as they relate to that subsection.

Decrees affirmed.


Judgment Entered.


_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/24/2026